David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

EMMANUEL OLUDELE,
Individually and on Behalf of All
Others Similarly Situated,

Plaintiff,

v.

MONSTER DIGITAL, INC., DAVID
H. CLARKE, STEVEN C. BARRE,
ROBERT B. MACHINIST,
CHRISTOPHER M. MINER, and
JONATHON CLARKS,

Defendants.

Civil Action No. 17-cv-6810

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**VIOLATIONS OF THE
SECURITIES EXCHANGE
ACT OF 1934**

Plaintiff Emmanuel Oludele ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder class action on behalf of himself and all other similarly situated public stockholders of Monster Digital, Inc. ("Monster" or the "Company") against Monster, David H. Clarke, Steven C. Barre, Robert B. Machinist, Christopher M. Miner, and Jonathon Clarks, the members of the

Monster's board of directors (collectively referred to as the "Board" or the "Individual Defendants," and, together with Monster, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger between Monster and Innovate Biopharmaceuticals, Inc. ("Innovate") through the transaction as alleged in detail herein (the "Proposed Transaction"). Plaintiff alleges the following based upon personal knowledge as to himself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1.    On June 19, 2017, Monster announced that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Monster Merger Sub, Inc., a wholly owned subsidiary of Monster, will merge with and into Innovate, with Innovate surviving the merger as a wholly owned subsidiary of Monster.  Under the terms of the Merger Agreement, Innovate stockholders will receive a number of newly issued shares of Monster common stock determined using an exchange ratio based on a pre-transaction valuation of $60 million for Innovate's business and $6 million for Monster's business.  Consequently, current Monster stockholders will collectively own approximately 9%, while Innovate stockholders will collectively own approximately 91% of the combined company on a pro forma basis.

2.    Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") filed with the SEC on August 25, 2017.  The Monster Board recommends in the Proxy Statement that Monster stockholders vote in favor of approving Proposed Transaction at the stockholder

CLASS ACTION COMPLAINT

special meeting that has not yet been scheduled and agree to exchange their shares pursuant to the terms of the Merger Agreement based among other things on internal and external factors examined by the Board to make its recommendation and an opinion rendered by the Company's financial advisor, Benchmark Company, LLC ("Benchmark").

3.    The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Monster's public stockholders. Notably, the Company's Enterprise Value—calculated using a 30-day volume-weighted share price of $0.5431—represents a substantial loss compared to the Company's 52-week high closing price of $2.16. In addition, between November 11, 2016 and March 10, 2017 the Company's stock price increased by approximately 30%.

4.    Moreover, in an article published on investor news website Simply Wall St News on April 19, 2017, the author noted that "[o]ver the past 12 months, Monster [] generated a[] [return on equity] of 387.6%, implying the company created 387.6 cents on every dollar of shareholders' invested capital." In contrast, the Company's industry only delivered a 24.5% return on equity.[1]

5.    In other words, Monster is poised for a period of financial growth, and the Merger Consideration inadequately compensates shareholders for their shares while substantially reducing their ability to partake in the Company's promising upside.

6.    As discussed further below, little real effort was made to engage in a true market check to find other parties interested in a strategic transaction with the Company to maximize value for Monster stockholders. The inadequate Merger

---

[1] Brent Freeman, *Did Monster Digital Inc (MSDI) Create Value for Shareholders?*, SIMPLY WALL ST NEWS (April 19, 2017), *available at* https://simplywall.st/news/2017/04/19/did-monster-digital-inc-msdi-create-value-for-shareholders/.

CLASS ACTION COMPLAINT

Consideration demonstrates the Board's lack of effort as it does not reflect the value of the Company or the fair value of Monster stock.

7.      To ensure the success of the Proposed Transaction, the Monster Board issued the Proxy Statement that fails to provide all material information. In particular, the Proxy Statement does not include a fair summary of the financial analyses performed by Benchmark and fails to disclose the projections for Monster (including a GAAP to Non-GAAP reconciliation mandated by the SEC).

8.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction or in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

## PARTIES

9.      Plaintiffs is, and at all relevant times has been, a shareholder of Monster.

10.     Defendant Monster is a Delaware corporation and maintains its principal executive offices at 2655 Park Center Drive, Unit C, Simi Valley, California 93065. Monster's common stock is listed and traded on the NASDAQ under the ticker symbol "MSDI."

11.     Individual Defendant David H. Clarke ("Clarke") is the Chief Executive Officer of Monster and has served as the Chairman of the Board since 2015.

12.     Individual Defendant Steven C. Barre is, and has been since 2016, an Monster director.

13.     Individual Defendant Robert B. Machinist is, and has been since 2016, an Monster director.

14.     Individual Defendant Christopher M. Miner is, and has been since 2016, an Monster director.

CLASS ACTION COMPLAINT

15.     Individual Defendant Jonathon Clarks is, and has been since 2016, an Monster director.

16.     The parties in paragraphs 11-15 are referred to herein as the "Individual Defendants" and/or the "Board," collectively with Monster the "Defendants."

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

18.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Monster maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUBSTANTIVE ALLEGATIONS

### I.     Company Background and the Proposed Transaction

20.     Monster designs, develops, and engineers consumer electronics, mobile products and computing applications.  The Company's license with Monster, Inc.

CLASS ACTION COMPLAINT

allows the Company to manufacture and sell certain high-end products utilizing the "Monster Digital" brand name.  The Company's primary product offerings includes: (i) action sports cameras used in adventure sport, adventure photography and extreme-action videography; (ii) ultra-small mobile external memory drive products for Apple iOS devices; (iii) On-The-Go Cloud devices on an exclusive basis which create a wi-fi hot spot for multiple users while simultaneously allowing data to be viewed, played or transferred among the connected storage; and (iv) broad selection of high-value memory storage products consisting of high-end, ruggedized Solid State Drives ("SSDs"), removable flash memory CompactFlash cards ("CF cards"), secured digital cards ("SD cards") and USB flash drives.   In addition to manufacturing and selling, the Company partners with Monster, Inc. to support the sales and marketing of these products on a global basis.[2]

21.    On June 19, 2017, Monster issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

**Monster Digital and Innovate Biopharmaceuticals Enter into**
**Letter of Intent regarding Reverse Merger**

Monster Digital and Innovate Biopharmaceuticals Enter into Letter of Intent regarding Reverse Merger SIMI VALLEY, CA (Marketwired - June 19, 2017) – Monster Digital, Inc. (Nasdaq: MSDI) ("Monster Digital"), today announced that it has entered into a non-binding letter of intent ("LOI") which contemplates a proposed reverse merger ("Merger") with Innovate Biopharmaceuticals, Inc. ("Innovate").

The LOI contemplates execution of a merger agreement (the "Merger Agreement") whereby the security holders of Innovate would receive Monster Digital securities in the Merger, in exchange for securities held in Innovate. Following the closing

---

[2] Monster Digital, Inc., Annual Report (Form 10-K) (March 31, 2017).

CLASS ACTION COMPLAINT

(the "Closing") of the anticipated Merger, Innovate would become a wholly owned subsidiary of Monster Digital, and Monster Digital, as the surviving company, would be renamed "Innovate Biopharmaceuticals, Inc." The common stock of the combined company would continue to trade on the Nasdaq Capital Market under a new symbol to reflect the name change.

For purposes of determining the exchange rate used to calculate the number of Monster Digital common shares that would be issued to Innovate's stockholders, the LOI provides that Innovate would have a deemed valuation of $60 million fully diluted by all of its outstanding shares of common stock and outstanding options and warrants, and Monster Digital would have a deemed valuation of $6 million fully diluted by all outstanding shares of its common stock, but excluding currently outstanding (i) warrants issued in connection with its initial public offering and (ii) warrants and options having a per share exercise price of $5.00 and above, such valuation to be reduced by any liabilities of Monster Digital assumed by Innovate at the Closing. Monster Digital's deemed valuation would be adjusted based on a net cash calculation prior to closing, which could be a negative number to the extent its liabilities exceed its cash and cash equivalents on hand at such time.

Based on these relative valuations (without adjustment), we anticipate that the security holders of Innovate and Monster Digital would hold approximately 90.90% and 9.10%, respectively, of the combined company, subject to proportional dilution for anticipated financing in connection with the closing of the Merger as referenced in the following paragraph.

Completion of the Merger is subject to the negotiation of a definitive Merger Agreement and related documentation, approval of the Merger by Monster Digital's Board of Directors and stockholders, approval of the continued listing by Nasdaq of Monster Digital common stock on the Nasdaq Capital Market on a post-Merger basis (which is anticipated to require raising additional financing in connection with the closing of the Merger), and satisfaction of other conditions that are to be negotiated as part of the Merger Agreement. Accordingly, there

CLASS ACTION COMPLAINT

can be no assurance that a Merger Agreement will be entered into or that the proposed Merger will be consummated. Further, readers are cautioned that those portions of the LOI that describe the proposed Merger, including the consideration to be issued therein, are non-binding.

Assuming Monster Digital and Innovate enter into the Merger Agreement, the parties will look to seek shareholder approval from Monster Digital's stockholders in the third quarter of 2017, subject to SEC staff review of the proxy statement to be filed by Monster Digital for the proposed transaction.

Commenting on the potential Merger, Innovate CEO Christopher P. Prior, Ph.D., stated: "After significantly expanding our pipeline with the addition of the only late-stage drug for celiac disease, I believe the next logical step in our corporate development is having our stock quoted in a public market. We believe that the greater access to capital and overall visibility afforded by operating as a publicly-traded organization should play a role in our ability to advance our clinical pipeline, as well as continue to in-license and develop drugs for autoimmune/inflammation diseases."

Monster Digital CEO David H. Clarke added, "Our Board of Directors and management believe that a merger with Innovate is the best option for our company. Upon a definitive merger agreement being signed and prior to the Closing, we anticipate that the Monster Digital operating business will be sold or spun off into a separate company."[3]

22.     Monster's stock is poised with growth.  Monster stockholders should be provided with sufficient financial information in the Proxy Statement to make an informed decision regarding the Proposed Transaction.

23.     For example, the Company's fourth quarter 2016 results, released on March 31, 2017, were positive:

---

[3] Monster Digital, Inc., Current Report (Form 8-K), at Exhibit 99.1 (June 20, 2017).

CLASS ACTION COMPLAINT

Monster Digital reported revenues of $1.1 million for the three-month period ended December 31, 2016 compared to revenues $779,000 for the previous quarter ended September 30, 2016, an increase of 37%, and compared to $1.4 million for the comparable 2015 fiscal period. The 2015 results consisted primarily of memory product sales which are substantially lower in the current quarter as the Company transitions away from low margin memory into higher margin products.[4]

24.    The Company's shift to higher margin products was reflected in their first quarter 2017 results, when Monster nearly doubled its revenues when compared to the same time period in 2016:

Net sales for the three months ended March 31, 2017 increased approximately 77% to $951,000 from $538,000 for the three months ended March 31, 2016. In the three months ended March 31, 2017, sales in our action sports camera line represented 87% of our total sales. In three months ended March 31, 2016, sales in our action sports camera line represented 24% of our total sales.[5]

25.    But the Board did little to seek out better proposals from other entities to maximize stockholder value.  As reflected in the Proxy Statement, the Board consummated the Proposed Transaction within two months.  Moreover, between May 5—when Monster first considered retaining Benchmark's financial advisory services—and July 3—when the Merger Agreement was executed—the Board did solicit, let alone consider, any potentially superior proposals from any third-parties. Proxy Statement 46-47.

## II.    The Materially Incomplete and Misleading Proxy Statement

26.    On August 25, 2017, Monster filed the Preliminary Proxy Statement

---

[4] *Monster Digital, Inc. Reports Financial Results for the Fourth Quarter and Year Ended December 31, 2016*, MARKETWIRED (March 31, 2017), *available at* http://www.marketwired.com/press-release/monster-digital-inc-reports-financial-results-fourth-quarter-year-ended-december-31-nasdaq-msdi-2206745.htm.

[5] *Monster Digital, Inc. Reports Financial Results for the First Quarter Ended March 31, 2017*, MARKETWIRED (May 19, 2017), *available at* http://www.marketwired.com/press-release/monster-digital-inc-reports-financial-results-first-quarter-ended-march-31-2017-nasdaq-msdi-2217508.htm.

CLASS ACTION COMPLAINT

with the SEC in connection with the Proposed Transaction. The Proxy Statement solicits the Company's shareholders to vote in favor of the Proposed Transaction. The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

27.    First, the Proxy Statement fails to provide material information concerning the Company's financial projections. Specifically, the Proxy Statement provides projections for the non-GAAP metrics EBIT and Adjusted EBITDA, but fails to provide line item projections for the metrics used to calculate EBIT or Adjusted EBITDA or otherwise reconcile the non-GAAP projections to GAAP. *See* Proxy Statement 54.

28.    When a company discloses information in a Proxy Statement that includes non-GAAP financial measures, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100.

29.    Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Monster has included in the Proxy Statement here), implicates the centerpiece of the SEC's disclosures regime:

CLASS ACTION COMPLAINT

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

30. In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[6] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[7] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts. Furthermore, the SEC has unambiguously stated that EBIT

---

[6] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[7] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

CLASS ACTION COMPLAINT

1    and EBITDA should be reconciled to net income, and that operating income would

2    not be considered the most directly comparable GAAP financial measure.[8]

3        31.    The above-referenced line item projections that have been omitted from

4    the Proxy Statement are precisely the types of "reconciling metrics" that the SEC

5    has recently indicated should be disclosed to render non-GAAP financial projections

6    not misleading to shareholders.

7        32.    In order to make the non-GAAP projections on page 54 of the Proxy

8    Statement not misleading, Defendants must disclose a reconciliation table of EBIT

9    to the most directly comparable GAAP measure and/or the line item projections for

10   the various metrics that were used to calculate Adjusted EBITDA set forth in on

11   page 54 of the Proxy Statement.

12       33.    The Proxy Statement also fails to disclose the standalone unlevered,

13   after-tax free cash flows that Monster was forecasted to generate during the period

14   of December 31, 2017 through December 31, 2027, which are material to Monster

15   shareholders because they are being asked to vote on a transaction that will reduce

16   their ownership interest by more than 90%.  The Proxy Statement notes that such

17   projections exist and were utilized by Benchmark in connection with its valuation

18   analyses.  Under sound corporate finance theory, the value of stock should be

19   premised on the expected future cash flows of the corporation; accordingly, the

20   question that Monster shareholders need to assess in determining whether to vote for

21   the Proposed Transaction is clear: is the Merger Consideration being offered now

22   fair in light of the free cash flows that Monster is expected to generate?  Without

23   these unlevered free cash flow projections, Monster shareholders will be unable to

24   answer this question and assess the fairness of the Merger Consideration.  The

25   omission of such projections renders the projections set forth on page 54 of the Proxy

26

27   _____

     [8] *See* C&DI Question 103.02

28

CLASS ACTION COMPLAINT

Statement and the summary of Benchmark's *Discounted Cash Flow Analysis* on pages 53 through 54 of the Proxy Statement materially incomplete and misleading.

34.    Indeed, financial experts agree that projections for Non-GAAP Adjusted EBITDA, which are included in the Proxy Statement here, are not a sufficient substitute for cash flow projections when attempting to understand the value of a company.  As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[9]

35.    Relying solely on Adjusted EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  Adjusted EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs which are critical to understanding a company's value.  As a result of these material differences between Adjusted EBITDA and unlevered free cash flow, many analysts recognize unlevered free cash flow as a much more accurate measure when it comes to analyzing the expected performance of a company.  Disclosing Adjusted EBITDA projections without unlevered cash flow projections is therefore inherently misleading.

36.    If corporate directors and officers choose to disclose financial projections in a proxy statement, they must provide complete and accurate projections, not merely excerpts of certain sets or line items of projections.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.

---

[9]    Elizabeth MacDonald, *The Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

CLASS ACTION COMPLAINT

37.    The Proxy Statement also fails to provide sufficient information for shareholders to assess the valuation analyses performed by Benchmark in support of its fairness opinion.

38.    With respect to Benchmark's *Selected IPO Analysis*, the Proxy Statement fails to disclose the individual multiples for each transaction and company utilized.  As a result of these omissions, shareholders are unable to assess whether Benchmark applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the Enterprise Value.  The omission of such information renders the summaries of these valuation analyses and the Enterprise Value on pages 52 through 53 of the Proxy Statement misleading.

39.    Similarly, the Proxy Statement fails to disclose the inputs and assumptions underlying the 1.5 to 2.5 terminal pricing multiples used in Benchmark's *Discounted Cash Flow Analysis* to calculate the weighted average cost of capital.  The omission of this material financial information renders the summary of Benchmark's *Discounted Cash Flow Analysis* on pages 53 through 54 of the Proxy Statement and the implied present Enterprise Value set forth therein incomplete and misleading.

40.    Indeed, as a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id*.  As Professor Davidoff explains:

**There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. **This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion** <u>**unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices**</u>. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions. *Id*. at 1577-78.

41.    Lastly, with respect to the *Background of the Merger* section, the Proxy Statement notes that Monster entered into a mutual nondisclosure/confidentiality agreement with Innovate. Proxy Statement 46. However, the Proxy Statement fails to disclose whether the agreement contained a "don't ask don't waive" provision that prohibit Innovate from making any public or private request that Monster waive the standstill restrictions, and further fails to disclose whether or not the standstill provisions remain in place or fell away upon the signing of the Merger Agreement. Monster shareholders would undoubtedly find such information material, as it relates directly to whether or not other interested bidders are now contractually prohibited from making them a superior offer. The omission of this information renders the vague reference to the nondisclosure/confidentiality agreement on page 46 of the Proxy Statement incomplete and misleading.

42.    In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material

CLASS ACTION COMPLAINT

information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## **CLASS ACTION ALLEGATIONS**

43.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Monster (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

44.    This action is properly maintainable as a class action because the Class is so numerous that joinder of all members is impracticable.  As of July 31, 2017, there were approximately 9.43 million shares of Monster common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Monster will be ascertained through discovery.

45.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

a.    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a) of the Exchange Act;

b.    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c.    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy

CLASS ACTION COMPLAINT

Statement.

    d.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

46.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

47.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class.

48.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

49.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## <u>COUNT I</u>

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

50.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization

CLASS ACTION COMPLAINT

in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

52.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

53.    SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement.    The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a). As set forth above, the Proxy Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

54.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

55.    Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) the background to

the Proposed Transaction; (ii) financial projections for the Company; and (iii) the valuation analyses performed by the Company's financial advisor.

56.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

57.    The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy Statement states that Benchmark reviewed and discussed their financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Benchmark as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to review Benchmark's analyses in connection with their

20

receipt of the fairness opinions, question Benchmark as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

58.   The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

59.   Monster is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy Statement.

60.   The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

CLASS ACTION COMPLAINT

61.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.    The Individual Defendants acted as controlling persons of Monster within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Monster, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

63.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

65.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing and approving the Merger Agreement.  The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and

CLASS ACTION COMPLAINT

considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

66.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

67.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

68.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy Statement;

C.    Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

CLASS ACTION COMPLAINT

1      E.    Granting such other and further relief as this Court may deem just and

2  proper.

3  **<u>JURY DEMAND</u>**

4      Plaintiff demands a trial by jury on all issues so triable.

5

6

7  DATED:  September 15, 2017

                Respectfully submitted,

8                  */s/ David E. Bower*

                David E. Bower

9  **OF COUNSEL**

10                 David E. Bower SBN 119546

**MONTEVERDE & ASSOCIATES**   **MONTEVERDE & ASSOCIATES PC**

11 **PC**                    600 Corporate Pointe, Suite 1170

12 Juan E. Monteverde        Culver City, CA 90230

The Empire State Building    Tel: (310) 446-6652

13 350 Fifth Avenue, Suite 4405   Fax: (212) 202-7880

14 New York, New York 10118    Email:  dbower@monteverdelaw.com

Tel:  212-971-1341

15 Fax:  212-202-7880         *Counsel for Plaintiff*

16 Email:

jmonteverde@monteverdelaw.com

17

18 *Counsel for Plaintiff*

19

20

21

22

23

24

25

26

27

28
24

CLASS ACTION COMPLAINT